[Civ. No. 22514.   First Dist., Div. One.   Jan. 20, 1967.]

JOHN J. CRACKNELL et al., Plaintiffs and Appellants, v. FISHER GOVERNOR COMPANY et al., Defendants and Respondents.

Partridge, O'Connell, Partridge & Fall and John B. Fall for Plaintiffs and Appellants.

O'Connor, Moran, Cohn & Lynch, Eugene F. Lynch, Lloyd F. Postel, Bronson, Bronson & McKinnon and Ernest M. Thayer for Defendants and Respondents.

ELKINGTON, J.—Plaintiffs appeal from an adverse judgment in favor of each defendant, entered upon jury verdicts

in an action brought to recover damages resulting from several fires at Forks Motel, Ukiah, on the early morning of November 27, 1960. Plaintiffs Cracknell and Richardson were absentee owners of the motel, which they had purchased in September 1959. Plaintiff Thompson was its resident manager.

The complaint charges that the fires were caused by a malfunctioning of a propane gas distribution system which had been installed upon the motel premises.

The complained-of distribution system consisted of a storage tank, a pressure regulator, a short length of copper tubing called a "pigtail" which connected the storage tank to the pressure regulator, and one (one witness said two) ell pipe fitting which was screwed into an exhaust vent of the regulator. The stated components of the distribution system will be referred to as "tank," "regulator," "pigtail," "ell," and "vent," respectively. Pipes leading from the regulator to the various appliances within the motel were owned and maintained by plaintiffs and are in no way a subject of the action.

Defendant Fisher Governor Company was the manufacturer of the regulator. Defendant A. F. Anton in February 1958 installed the tank, pigtail, regulator and ell of the distribution system, the ownership of which he retained. He thereupon commenced selling gas to the motel. He had taken the regulator from an unopened package which had been sealed by Fisher. In early 1959 the motel management decided to buy its propane gas from another distributor, defendant Donald Hoover. In accordance with custom, Anton then sold the distribution system to Hoover who continued to furnish gas and who had complete ownership and control of the distribution system continually up to the time of the fires. The distribution system as installed by Anton remained unchanged under Hoover's ownership.

The propane gas in the tank and pigtail was under pressure of between 50 and 150 pounds per square inch. Under such pressure it is in a liquid state. The proper usable pressure at the motel's appliances was about 6 ounces per square inch at which level the propane is gaseous. The function of the regulator was to reduce the tank pressure to a safe and usable appliance pressure.

The regulator is an intricate mechanical device which contains two chambers separated by a gastight flexible neoprene (rubber-like) membrane. High pressure gas enters one cham-

ber which will be called the "gas chamber." Its pressure being reduced, the gas then enters the pipe system leading to the appliances. A safety relief valve is incorporated as part of the gas chamber. If gas more than two or three times the usual appliance pressure leaves the regulator the outgoing supply is automatically shut off by the safety relief valve. The second chamber (air chamber) contains air at atmospheric pressure. This latter pressure is maintained through the vent and ell which leads from the air chamber to the outside air.

Heavy rainstorms had occurred during the two weeks preceding the night of the fires. The minimum temperature for November 27, 1960, was recorded at 32 degrees Fahrenheit by the Ukiah Fire Department.

Four separate fires broke out in the motel, apparently simultaneously. Each started around the valve of a water heater. Each water heater was located a considerable distance from the others. After the fires, the top of the regulator was removed. Chief Bechtol of the Ukiah Fire Department testified that "maybe a couple or three or four big tablespoons" of water flowed out of the air chamber through the vent and ell. The regulator had been installed in a flat position which would indicate that the vent and the neoprene membrane separating the two chambers were in a horizontal position. The ell was pointed out and down. In the horizontal position two or three or four big tablespoons of water probably would not run out by gravity from the air chamber.

Expert witnesses testified that in their opinions the water which had somehow entered the air chamber of the regulator had frozen causing the regulator and its safety relief valve to lock in an "open" position—thus allowing gas at the high tank pressure to reach the motel's heaters. This increase in pressure said witness Altorfer, a mechanical engineer, "relieved itself by a jet of gas squirting out at the connections near the gas heaters [and their pilot lights], and consequently the fire."

Plaintiffs' theory as stated in the complaint was that the fires and resultant damage were proximately caused by "the negligent design, manufacture, assembly, testing, inspecting, supplying, distribution, installation, repairing, servicing and maintenance [of the distribution system] on the part of defendants and each of them." The case was tried on the theories of negligence and "strict liability." (*Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57 [27 Cal.Rptr. 697, 377 P.2d 897]; *Vandermark* v. *Ford Motor Co.* (1964) 61

Cal.2d 256 [37 Cal.Rptr. 896, 391 P.2d 168].) Each theory seems supported by the complaint.

At the trial plaintiffs produced evidence (1) tending to show negligence of defendants, and (2) in support of their contention of "strict liability."

Plaintiffs' first contention of error is stated as follows: "Recovery by plaintiffs was improperly limited to proof of a defective regulator."

The court gave full, and generally uncomplained-of, instructions on the issue of negligence. On the "strict liability" issue the court, after rejecting certain of plaintiffs' proposed instructions, of its own motion gave the following: "You are instructed that in order to establish the liability of defendants Fisher, Anton and Hoover, the plaintiffs must prove by a preponderance of the evidence that their property was injured while using the pressure regulator in a way in which it was intended to be used, and that as a result of defect in design, manufacture, or assembly of the regulator, of which plaintiffs were not aware, the equipment was unsafe for its intended use."

This instruction, by its terms, compelled a verdict for defendants on the negligence issue even though the jury might have found that the complained-of damages proximately resulted from the negligent installation, maintenance, servicing or inspection of the distribution system by defendants. It had the effect of allowing recovery only if the jury found that as a "result of defect in design, manufacture, or assembly of the regulator, of which plaintiffs were not aware, the equipment was unsafe for its intended use."

Evidence, unrelated in any way to the design, manufacture or assembly of the regulator, from which a permissible inference of negligence as to each defendant could be drawn, was placed before the jury. We shall set forth some of such evidence.

As the regulator was installed and maintained (in a horizontal position), a considerable amount of water could be, and apparently was, trapped and unable to run out. If the regulator had been installed vertically with the vent pointing downward water could not enter, and any water in the air chamber would flow out by gravity. Such a vertical installation in all respects would be a perfectly satisfactory installation.

The regulator was installed on top of the tank. Defendant Hoover testified that children sometimes would "ride horse-

back" on the tank. After the fires, witness Rogers found the ell which was screwed into the vent of the regulator to be "finger loose" so that it could be turned with the fingers. If the ell was turned upward it would act as a funnel for the catchment of water. The ell was no part of the regulator as manufactured by Fisher. It had been installed by Anton and maintained successively by Anton and Hoover.

A conflict existed as to whether the National Board of Fire Underwriters recommended the installation of a "raincap" over the regulator and ell. At least it is undisputed that such a raincap would tend to prevent water from entering the regulator. Defendant Hoover testified that the majority of regulators installed by him did have such a rain cover.

Evidence was placed before the jury that defendant Fisher had given no instructions to installers and users of its regulators as to how they should be installed. Fisher presumed "they will know how to make their installation."

In one of its instructions the court stated to the jury: "Ordinary care has been defined as that degree of care which people of ordinarily prudent behavior could be reasonably expected to exercise under the circumstances of a given case. The care required must be in proportion to the danger to be avoided and the consequences that might reasonably be anticipated. The risk incident to dealing with propane gas and gas pressure regulators requires a great deal of care to be exercised. In other words, the standard of care required of the reasonable person when dealing with such dangerous articles is so great that a slight deviation therefrom will constitute negligence."

Under the evidence and the court's instructions the jury might well have inferred negligence as to each of the named defendants.

■ The jury was thus confronted with contradictory and conflicting instructions. The so-called "negligence" instructions authorized a plaintiffs' verdict based on negligence not related to "strict liability" or the defective design, manufacture or assembly of the regulator. The complained of instruction, however, authorized a plaintiffs' verdict only upon proof of a defect in design, manufacture or assembly of the regulator.

Instructions must be considered as a whole (as the jury were here instructed) and minor errors in one instruction may sometimes be cured by another. But the prejudicial effect

of a misstatement of an important principle of law cannot ordinarily be overcome by another declaration contradicting it. The jury are bound and instructed to accept the court's instructions as correct statements of law. They are likely to be confused and misled by conflicting statements and it is not easy to determine which charge controlled their determination. Hence the giving of instructions which are contradictory in essential elements is a common cause of reversible error. (See *Shaw* v. *Pacific Greyhound Lines* (1958) 50 Cal.2d 153, 156 [323 P.2d 391]; *Cummings* v. *City of Los Angeles* (1961) 56 Cal.2d 258, 266-267 [14 Cal.Rptr. 668, 363 P.2d 900]; *Roberts* v. *Permanente Corp.* (1961) 188 Cal.App.2d 526, 531 [10 Cal.Rptr. 519]; 2 Witkin, Cal. Procedure, (1954) § 68, p. 1799.) We must conclude that the conflicting and contradictory instructions here given were prejudicially erroneous.

The second contention of plaintiffs is stated as "The court erroneously excluded defendant Fisher Governor from application of the doctrine of res ipsa loquitur." On this point the record reflects the unequivocal stipulation of plaintiffs that "so far as the res ipsa instructions go the Court will just mention the names of Anton and Hoover." This contention accordingly is without merit.

The remaining point raised by plaintiffs relates to the use by the court in certain instructions of the words "negligence and/or strict liability" and "negligence or a defendant's wrong." This language and error, if it be error, will undoubtedly not be iterated at a retrial. A determination of this point seems unnecessary to a disposition of this appeal.

For the reasons stated the judgment is reversed as to each defendant below.

Molinari, P. J., and Sims, J., concurred.